**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF OHIO**
**(Western Division)**

| | | |
|---|---|---|
| **CYNTHIA H. BOYD** | : | **CASE NO. 3:16-cv-00009** |
| **21755 State Route 739** | : | |
| **Raymond, OH 43067** | : | **Judge** |
| | : | |
| **and** | : | **CLASS ACTION COMPLAINT FOR** |
| | : | **VIOLATION OF THE OHIO** |
| **THOMAS E. FLANDERS** | : | **SECURITIES ACT, O.R.C. §1707.01** |
| **11101 Ashbury Meadows, Dr.** | : | *et seq.* |
| **Centerville, OH 45458** | : | |
| | : | **JURY DEMAND ENDORSED** |
| **Plaintiffs,** | : | **HEREON** |
| | : | |
| **On behalf of themselves and all others** | : | |
| **similarly situated.** | : | |
| | : | |
| **v.** | : | |
| | : | |
| **THE KINGDOM TRUST COMPANY** | : | |
| **1105 Ky-121** | : | |
| **Murray, KY 42071** | : | |
| | : | |
| **and** | : | |
| | : | |
| **PENSCO TRUST COMPANY** | : | |
| **595 Market Street, 4th Floor** | : | |
| **San Francisco, CA 94105-7576** | : | |
| | : | |
| **And** | : | |
| | : | |
| **John Doe, 1-25** | : | |
| **(Names and Addresses Unknown)** | : | |
| | : | |
| **Defendants.** | | |

Plaintiffs Cynthia H. Boyd and Thomas E. Flanders (individually "Ms. Boyd" and "Mr.

Flanders" and collectively the "Plaintiffs"), for themselves and on behalf of all other similarly

situated persons, based upon the investigation of their counsel, the Internal Revenue Service, the

Federal Bureau of Investigations, and the Ohio Department of Commerce – Securities Division, state as follows for their class action complaint:

## INTRODUCTION

1.      Between at least January 2010 through October 2014, William Apostelos and his associates (collectively "Apostelos") perpetrated a fraudulent scheme – a Ponzi scheme – against investors.  During that time period, Apostelos, individually and through his various companies, raised at least $66.7 million from at least 350 investors. Apostelos portrayed himself as a sophisticated investor and businessman, and he exploited his network of clients, business associates, and friends to attract new investors.

2.      Throughout the scheme, Apostelos knowingly made multiple misrepresentations to recruit prospective investors. For example, Apostelos told a number of investors their investment funds would be pooled with funds from other investors and invested in real estate or used to make short-term loans at high interest rates to small businesses and farmers, with returns being generated by the underlying investments. Apostelos also told certain investors their funds would be pooled with other investor funds and invested in stocks or precious metals. And Apostelos told certain investors he would place their funds in a pooled brokerage account and invest them in publicly traded stocks, bonds, and options. All of these representations were false.

3.      In reality, Apostelos funneled nearly all the investor funds to his company's bank accounts and used them to make Ponzi-like payments to earlier investors and promoters, to finance other businesses he and his wife owned, and to pay for their personal expenditures.

4.      To facilitate his scheme, Apostelos had Plaintiffs and other similarly situated investors to transfer their individual retirement accounts ultimately to Defendants Pensco Trust

2

Company, The Kingdom Trust Company, and/or John Does, 1-25 (collectively the "Defendants").

5.      Defendants thereafter used the funds from these accounts to purchase unregistered securities sold by Apostelos in violation of Ohio Revised Code 1707 *et seq*.

6.      As a result of his scheme, Apostelos violated Ohio securities laws by, among other things, offering and selling unregistered securities.

7.      Plaintiffs bring this Class Action on behalf of themselves and all other similarly situated persons who, as a result of Apostelos' Ponzi-scheme, lost money held in IRA accounts for which Defendants were trustees/custodians.

8.      Defendants are therefore liable to Plaintiffs pursuant to O.R.C. §1707.43 for aiding or otherwise participating in the sale of securities in violation of the Ohio Securities Act.

<u>**PARTIES**</u>

9.      Plaintiff, Cynthia H. Boyd resides in Raymond, Ohio.

10.     Plaintiff, Thomas E. Flanders, resides in Centerville, Ohio.

11.     Defendant Kingdom Trust is a privately held Kentucky limited liability company with its headquarters and principal place of business at 1105 KY-121, Murray, Kentucky.

12.     Defendant Pensco Trust Company is a privately held trust company chartered by the State of New Hampshire with its headquarters and principal place of business at 595 Market Street, 4th Floor, San Francisco, California.

13.     Defendants John Does, 1-25, are Ohio or foreign corporations, partnerships, associations or other legal entities whose identity is currently unknown. Defendants John Does,

3

1-25, are capable of being sued and once their identity and whereabouts is established, they will be served with a copy of summons and complaint as provided by law.

## JURISDICTION

14.     The claims asserted herein arise under Ohio's Securities Act, O.R.C. 1707 *et seq*.

15.     This Court has jurisdiction over this action pursuant to 28 U.S.C.§1332(a), in that Plaintiffs and Defendants are citizens of different states and the claims of the named Plaintiffs each exceeds $75,000.

16.     During the relevant time period, all of the Defendants regularly transacted business in Ohio, derived substantial revenue and profited from their respective activities in Ohio with Ohio residents, caused tortious injury by acts inside and outside Ohio, and had representatives/agents located in Ohio. They each have had sufficient contacts with Ohio such that it is fair and reasonable to require them to defend this action in Ohio.

17.     Defendants purposely availed themselves of the laws of Ohio by transacting business with Apostelos and Plaintiffs. Defendants knew Apostelos operated, at least in part, in Ohio and solicited investors in Ohio. Defendants agreed to provide account related services to residents of Ohio who purchased securities from Apostelos with the aid and participation of Defendants. Defendants opened retirement accounts funded by the transfer of assets from Ohio. Defendants were in regular and consistent direct contact with Plaintiffs for years in Ohio through numerous written correspondence in the form of periodic statements, billings and customer service emails. Each of the Defendants took custody of substantial assets owned by Ohio residents. After Plaintiffs transferred retirement funds to Defendants, Defendants transmitted some or all of those same funds into Ohio to Apostelos as part of the purchase by Defendants of

4

unregistered securities from Apostelos.   In return, Defendants would receive securities from Ohio to be held in the retirement accounts of Plaintiffs.  Plaintiffs' claims arise directly from Defendants transacting business in Ohio.

18.    Further, by actively aiding or otherwise participating in the sale of unregistered securities in Ohio, Defendants caused damages to Plaintiffs in Ohio.

19.    Venue is proper in this Court pursuant to 28 U.S.C. §1391 in that many of the acts and transactions giving rise to this action occurred in this district and because the Defendants are all subject to personal jurisdiction in this district.

## FACTS

20.    Apostelos solicited investors through his associated companies and in his individual capacity.  He offered and sold investors promissory notes issued in his own name or in the name of one of his associated companies. He also offered and sold membership units in another of his associated companies.

### Sale of Unregistered Offerings of Midwest Green Membership Units

21.    In September 2009, Apostelos, along with two other individuals, formed Midwest Green Resources, LLC ("Midwest Green").  Midwest Green purported to be in the business of investment and real estate asset management.  Apostelos, through Midwest Green, marketed an offering of $10 million in equity securities.

22.    Between July 2010 and August 2014, Apostelos raised money from investors by offering and selling membership units in Midwest Green (hereinafter the "Midwest Green Securities"). These Midwest Green Securities, which were purportedly equity interests in

5

Midwest Green, were securities as the term is defined in the Ohio Securities Act, O.R.C. §1707.01.

23.     Between July 2010 and August 2014, Apostelos and Midwest Green conducted two unregistered offerings of Midwest Green Securities, during which they raised approximately $9.8 million from at least 60 investors. These offerings were not registered and were not eligible for any exemption from registration.

24.     The investor funds raised through the sale of Midwest Green Securities were initially deposited in Midwest Green bank accounts controlled by Apostelos.  Ultimately the funds raised through the sale of Midwest Green Securities were funneled to other bank accounts Apostelos controlled.  The investor funds were then used to pay earlier investors and promoters, finance Apostelos' and his wife's other businesses, and pay for their personal expenses.

### Sale of Unregistered Offerings of Promissory Notes

25.     On October 19, 2009, only a month after he formed Midwest Green, Apostelos formed WMA Enterprises, LLC, an Ohio limited liability company purported to be in the business of investment and real estate asset management.

26.     Between January 2010 and October 2014, Apostelos, through WMA, raised at least $56.9 million from approximately 330 investors, primarily by issuing promissory notes offering high, guaranteed rates of interest (hereinafter the "Promissory Note Securities"). These Promissory Note Securities were securities as the term is defined in the Ohio Securities Act, O.R.C. §1707.01.

27.     In exchange for their investment, Apostelos gave investors the Promissory Note Securities issued either in his name or by WMA. The Promissory Note Securities were uninsured

6

and uncollateralized and promised guaranteed interest rates, often ranging from 10 to 35% or more.

28.     The Promissory Note Securities generally had terms ranging from two or three months to a year. At the end of the term, Apostelos gave investors the option of taking their money out or reinvesting by rolling over the note.  Most investors rolled over their Promissory Note Securities, reinvesting their principal and, often, the purported interest earned during the previous term.

29.     The investor funds raised through Promissory Note Securities, regardless of whether they were issued by Apostelos or by WMA, were deposited in the WMA bank accounts, which Apostelos controlled.  The investor funds were then used to pay earlier investors and promoters, finance Apostelos' and his wife's other businesses, and pay for their personal expenses.

30.     The Promissory Note Securities offering conducted by Apostelos and WMA was not registered and was not eligible for any exemption from registration.

31.     The "Promissory Note Securities" and "Midwest Green Securities" are collectively hereinafter the "Unregistered Securities."

**The Apostelos Ponzi Scheme**

32.     From January 2010 to October 2014, Apostelos raised a total of at least $66.7 million in investor funds, including at least $56.9 million in investor funds deposited directly into WMA's bank accounts (raised primarily through Promissory Note Securities) and approximately $9.8 million in investor funds raised through the sale of Midwest Green Securities and deposited into Midwest Green's bank accounts.

2275711.4

33.     Apostelos did not use investor funds for the purposes he described when soliciting new investors or when trying to retain investors.  Apostelos did not maintain separate "funds" for different investment purposes. Instead, nearly all of the investor funds generated from the sale of the Unregistered Securities were funneled into WMA's bank accounts, often within hours or days of being initially deposited.

34.     The majority of the approximately $66.7 million raised from investors through the sale of Unregistered Securities was used to pay approximately $52.8 million to investors and at least $6.3 million to promoters, with the rest used to fund Apostelos' personal expenses, fund other businesses controlled by Apostelos and his wife, and pay their day-to-day expenses.

35.     Apostelos did not use legitimate business revenue or investment returns to fund the approximately $52.8 million paid out to investors between January 2010 and October 2014. Instead, Apostelos used investor funds to pay purported returns and principal to other investors.

36.     On October 15, 2014, a group of investors filed a petition for involuntary bankruptcy against Apostelos under Chapter 7.  The bankruptcy action is ongoing.

37.     On October 29, 2015, Apostelos and his wife were indicated on twenty-seven federal charges, including conspiracy to defraud investors through the Ponzi scheme.

**Defendants aided or otherwise participated in the sale of the Unregistered Securities**

38.     For some of the Plaintiffs, their only source of investable assets were held in traditional Individual Retirement Accounts.  IRAs are a form of restricted savings accounts intended to provide investors with certain tax benefits and a source of income for retirement.  All IRA accounts are held for investors by custodians or trustees, including banks, trust companies, or investment firms.  Trustees/Custodians of traditional IRA accounts are responsible for

8

investing the funds (without input from the account owner) in traditional portfolio options such as stocks, bonds, CDs and mutual funds and are generally limited in investment options.

39.     A self-directed IRA ("SDIRA") is an IRA held by a trustee/custodian that permits investment in a broader set of assets than is permitted by most IRA trustees/custodians.   SDIRA trustees/custodians maintain custody of the IRA assets and all transaction and other records pertaining to them, file required IRA reports, issue client statements, and perform other administrative duties on behalf of the SDIRA owner of the IRA account.  And while most traditional IRA trustee/custodians limit the holdings in IRA accounts to firm-approved stocks, bonds, mutual funds and CDs, trustees/custodians for self-directed IRAs allow investors to invest retirement funds in other types of assets such as real estate, promissory notes, tax lien certificates, and private placement securities.

40.     In 2011, the SEC and numerous state securities regulators identified SDIRAs as having significant increased and unique risks associated with being used as part of fraudulent investment schemes.  As noted by the SEC:

> According to a 2011 report by the Investment Company Institute, U.S. investors held approximately $4.7 trillion in IRAs. Estimates from various sources approximate that investors  hold 2 percent, or $94 billion, of IRA retirement funds in self-directed IRAs. The large amount of money held in self-directed IRAs makes them attractive targets for fraud promoters. Fraud promoters also may target other types of retirement accounts by attempting to lure investors into transferring money from those accounts to new self-directed IRAs in order to participate in the fraud promoter's scheme.

> In particular, fraud promoters who want to engage in Ponzi schemes or other fraudulent conduct may exploit self-directed IRAs because they permit investors to hold unregistered securities and the custodians or trustees of these accounts likely have not investigated the securities or the background of the promoter…[1]

---

[1]     See http://www.nasaa.org/5866/self-directed-iras-and-the-risk-of-fraud/

41.     Each of the Plaintiffs had assets in traditional, non-self-directed IRA accounts. Apostelos knew trustees/custodians of traditional IRA accounts would never allow assets held in IRA accounts over which they were trustees/custodians to be used for the purchase of the Unregistered Securities.  So, in order to attract money from investors such as Plaintiffs who had assets in traditional IRA accounts, Apostelos had to use the services of a trustee/custodian that would allow investors to use their IRA investments for the purchase of the Unregistered Securities.

42.     The Defendants are indeed all trustees/custodians for SDIRAs and each of the Defendants collected respective fees from Plaintiffs for acting as the trustee/custodian of their IRAs.

43.     Kingdom Trust represents in its marketing materials:

Kingdom Trust is an independent qualified custodian and a non-depository trust company regulated by the South Dakota Division of Banking. We specialize in unique and innovative custody solutions for individual investors, investment sponsors, family offices, advisory firms, broker-dealers and various other investment platforms. We currently serve over 78,000 clients and have over $8.5 billion in assets under custody.
***
Our team members are friendly, knowledgeable and dedicated to you, and each understands that your experience is most important. We assign each client a Relationship Manager to act as a guide through the account opening, funding and initial investment processes. Our Business Development team creates lasting and successful relationships with our clients; and our dedicated Client Services team handles transactions promptly and efficiently with the utmost attention paid to the needs and requests of investors and advisors.

44.     Pensco represents in its marketing materials:

Because holding alternative assets in retirement accounts requires special knowledge and handling, many broker dealers don't offer alternatives as an option for IRAs, that's where we come in. Founded in 1989, PENSCO Trust Company is a regulated, self-directed IRA custodian with more than $10 billion in assets under custody and 45,000 clients.

10

PENSCO is the leading alternative asset custodian, with more than two decades of expertise in holding private equity, real estate, notes, and other non-exchange traded assets. We possess knowledge and experience with IRS rules and regulations for holding alternatives in IRA…Our services don't end with individual investors, though. PENSCO Trust also provides solutions and services to Registered Investment Advisors, financial planners, investment sponsors, crowdfunding platforms and professional service providers seeking an alternative asset custodian for their clients.

PENSCO experts review each new transaction to ensure proper custody of the asset and document IRA ownership for tax deferment and IRS reporting needs - over the lifetime of the asset. We have the knowledge needed to efficiently handle all aspects of account administration and as alternative asset experts we are able to guide clients through complex transactions within qualified accounts.

As a self-directed IRA custodian, PENSCO is responsible for facilitating the initial investment and administering the assets in our clients' accounts over the course of the assets lifetime. PENSCO manages the extensive recordkeeping required by the IRS and handle the reporting of contribution, distribution and investment activity within the account, including quarterly reports, processing of annual asset valuations and other documentation.

45.     To perpetrate the Ponzi scheme, including the sale of the Unregistered Securities, Apostelos had Plaintiffs and other investors open accounts with one or more of the Defendants and transfer custody of their IRAs to one or more of the Defendants.

46.     Apostelos or his associates, on behalf of the Defendants, routinely assisted Plaintiffs with completing account applications and related documents required by Defendants to transfer IRA accounts into Defendants' custody.  All of the documentation required by the Defendants was completed either at Plaintiffs' residence and/or Apostelos' business location in Springboro, Ohio.

47.     Defendants opened IRA accounts for Plaintiffs, accepted retirement funds of Plaintiffs, and transmitted account information for Plaintiffs and/or persons or companies associated with Apostelos.  Thus, in their capacity as trustees/custodians, Defendants took title, custody, and possession, of all assets in Plaintiffs' IRA accounts.

2275711.4

48.     Once Defendants had opened accounts for Plaintiffs, Apostelos would either have the Plaintiffs request the Defendants purchase Unregistered Securities using IRA assets or Apostelos would have the Plaintiffs execute powers of attorney giving him (or one of his associates) the ability to request the Defendants purchase Unregistered Securities using the IRA assets.

49.     The purchase of Unregistered Securities with Plaintiffs' IRA assets could not have occurred without Defendants' participation in and execution of the purchase.  That is, without Defendants' assistance with and participation in the purchase of the Unregistered Securities, Apostelos would not have been able to sell the Unregistered Securities to Plaintiffs.

50.     Depending on the asset to be purchased, the Defendants each have requirements which must be met before Defendants will purchase an asset on behalf of an IRA.

51.     As an example, when purchasing a promissory note (e.g. the "Promissory Note Securities" sold by Apostelos), Pensco requires certain information be provided and documents to be executed before Pensco will execute the purchase on behalf of the IRA.  These include:

Requiring the execution of an Unsecured Note Investment Authorization Form;

Requiring the execution of a Loan Servicing Agreement;

Requiring the lender's name on the note read "Pensco Trust Company, Custodian FBO (Client Name) IRA";

Requiring the lender's address be listed as "PO Box 173859, Denver, CO 80217"; and

Requiring a maturity date no longer than 10 years from the date of the note.

52.     In addition, depending on whether the borrower is a corporation, other entity, or an individual, before Pensco will execute the purchase of a promissory note, Pensco requires it receive:

2275711.4

A copy of the executed promissory note before funding (in the case of a corporation or other entity);

The original note after funding (in the case of a corporation or other entity);

Subscription agreement completed and signed by the Account Owner as "read and approved";

Articles of Incorporation or Operating Agreement/Private Placement Memorandum for borrower;

Certificate of Good Standing for borrower;

Amortization or Payment Schedule; and

The original note with a notarized signature by the borrower before funding (in the case of an individual borrower).

53.     Each Defendant has similar requirements which had to be met before the

Defendant would purchase on behalf of the IRA any Unregistered Security sold by Apostelos.

**Cynthia H. Boyd**

54.     In March 2014, at Apostelos' direction, Ms. Boyd opened an account with

Defendant Kingdom Trust, and thereafter transferred custodial responsibilities from her

traditional IRA trustee/custodian to Kingdom Trust.

55.     Apostelos and/or his associates, on behalf of Kingdom Trust, assisted Ms. Boyd

in executing the documents necessary to transfer custodial responsibility for her IRA to Kingdom

Trust.  As a result, Kingdom Trust established Account No. xxxx4009 in the name of Cynthia H.

Boyd.

56.     On or after June 13, 2014, Kingdom Trust, on behalf of Ms. Boyd's IRA account,

purchased an Unregistered Security (a Promissory Note Security) from Apostelos (the "Boyd

Unregistered Security").  The Boyd Unregistered Security was for $400,000, the lender was The

13

Kingdom Trust Co., Custodian FBO, Cynthia H. Boyd Traditional IRA xxxx4009 at P.O. Box 870, Murray, KY 42071. A true and accurate copy of the Boyd Unregistered Security purchased by Kingdom Trust for the benefit of Ms. Boyd is attached hereto as Exhibit 1.

57. As part of the purchase of the Boyd Unregistered Security, Kingdom Trust required Apostelos to execute a Promissory Note Investment Representation Letter and provide a Private Debt Servicing Agent Agreement, which are attached hereto respectively as Exhibits 2 and 3.

58. Pensco and John Does, 1-25, also required similar documents to be executed before they approved the purchase of an Unregistered Security.

59. The Boyd Unregistered Security was a security as defined in the Ohio Securities Act, O.R.C. §1707.01, and was required to be registered. It was not registered.

60. As a result of the fraudulent scheme aided by Defendant Kingdom Trust, the Boyd Unregistered Security is worthless and Ms. Boyd has lost all or substantially all of the balance of her Kingdom Trust account.

**Thomas E. Flanders**

61. Sometime before February 25, 2011, at Apostelos' direction, Mr. Flanders opened an account with Defendant Pensco and transferred custodial responsibilities from his prior traditional IRA trustee/custodian to Pensco. Apostelos and/or his associates, on behalf of Pensco, assisted Mr. Flanders in executing the documents necessary to transfer custodial responsibility for his IRA to Pensco. As a result, Pensco established Account No. xxxx4768 in the name of Thomas E. Flanders.

14

62. On or after February 25, 2011, Pensco, on behalf of Mr. Flanders' Pensco IRA account, purchased an Unregistered Security (a Midwest Green Security) from Apostelos (hereinafter the "Flanders Unregistered Security"). Pensco paid $497,000 for the Flanders Unregistered Security. A copy of the Flanders Unregistered Security is not attached because Pensco is in possession of the security.

63. The Flanders Unregistered Security was a security as defined in the Ohio Securities Act, O.R.C. §1707.01, and was required to be registered. It was not registered.

64. As a result of the fraudulent scheme aided by Defendant Pensco, the Flanders Unregistered Security is worthless and Mr. Flanders has lost all or substantially all of the balance of his Pensco IRA account.

## CLASS ACTION ALLEGATIONS

65. Plaintiffs bring this action as a class action pursuant to Rules 23(B)(1) and (B)(3) of the Federal Rules of Civil Procedure. The proposed Class is described as and consists of:

> All persons who, as of October 15, 2014, had self-directed IRAs for which Kingdom Trust Company, Pensco Trust Company, and/or John Does, 1-25, served as the IRA trustee or custodian and for which IRA funds were used by Kingdom Trust Company, Pensco Trust Company, and/or John Does, 1-25, to purchase Unregistered Securities on or after January 7, 2011. Excluded from this Class are the Defendants, subsidiaries and affiliates of the Defendants, the officers, directors and employees of Defendants, members of their immediate family and their legal representatives, heirs, successors or assigns and any entity in which any of the foregoing has a controlling interest.

66. **_Numerosity._** The members of the proposed Class are so numerous that joinder of all members is impracticable. While the exact number of the proposed Class is unknown to Plaintiffs at this time and can only be ascertained through appropriate discovery, Plaintiffs believe there are more than 100 members of the proposed Class. Members of the proposed Class can be identified from records maintained by the Defendants and/or their agents and can be

15

notified of this action's pendency by mail, using a form of notice customarily used in actions of this kind.

67. ***Common Questions of Law and Fact:*** Plaintiffs' claims are typical of every member of the proposed Class because all members of the proposed Class were similarly affected by Apostelos' Ponzi scheme in that Defendants, by, among other things, using the proposed Class members' IRA accounts to purchase one or more of the Unregistered Securities, aided or otherwise participated in the sale of securities in violation of the Ohio Securities Act. The common legal and factual questions include, but are not limited to:

    a. Whether the Defendants aided or otherwise participated in the sale of securities in violation of O.R.C. §1707.43 of the Ohio Securities Act;

    b. Whether the members of the Class are entitled to void (rescind) the purchase of the Unregistered Securities pursuant to O.R.C. §1707.43; and

    c. Whether Defendants are liable for the full amount paid by the members of the Class for the Unregistered Securities and for all taxable costs pursuant to O.R.C. §1707.43.

68. ***Typicality.*** Plaintiffs' claims are typical of the claims of the members of the Class as they and members of the Class sustained damages arising out of Defendants' aiding or otherwise participating in the sale of securities in violation of the Ohio Securities Act as complained of herein.

69. ***Adequacy of Representation.*** Plaintiffs will fairly and adequately protect the interests of all members of the Class as Plaintiffs are not antagonistic to the claims of the Class and there are no conflicts between Plaintiffs and the Class claims. Plaintiffs have retained counsel competent and experienced in class and complex litigation.

70.     *Superiority*.  A class action is superior to all other available means for the fair and efficient adjudication of this controversy.  The damages or other financial detriment suffered by individual Class members may be relatively small compared to the burden and expense that would be incurred by individual litigation of claims against the Defendants.  Thus, it would be impossible for each member of the Class, on an individual basis, to obtain effective redress.

71.     Class certification is also appropriate because prosecuting separate actions against the Defendants would create a risk of inconsistent or varying adjudications with respect to individual Class members.  Further adjudications with respect to individual members of the putative class would be dispositive of other members not party to the adjudications or would substantially impair or impede the ability to protect their interests.

## COUNT 1:
## ILLEGAL SALE OF A SECURITY

72.     Plaintiffs reallege the foregoing paragraphs as if fully stated herein.

73.     The Unregistered Securities (Promissory Note Securities and Midwest Green Securities) are securities as defined in O.R.C. §1707.01.  These securities were not registered and were not subject to exemption of the registration requirements.

74.     The transactions by which Defendants purchased one or more of the Unregistered Securities with assets from Plaintiffs' and Putative Class Members' IRA accounts constitutes a sale as the term is defined in O.R.C. §1707.01(C).

75.     O.R.C. §1707.44 prohibits anyone from selling securities in Ohio without being licensed by the state pursuant to O.R.C. §1707.16.  Furthermore, O.R.C. §1707.44 also prohibits investment advisors from employing any scheme to defraud investors.

76.     Apostelos was not licensed by the State of Ohio to sell securities.

17

77.     Therefore, each sale by Apostelos of an Unregistered Security was the illegal sale in violation of the Ohio Securities Act.

78.     Pursuant to O.R.C. §1707.43 (a), every sale or contract for sale made in violation of Chapter 1707 of the Revised Code is voidable at the election of the purchaser, and the person making such sale or contract for sale, and **every person who has participated in or aided the seller in any way in making such sale or contract for sale**, are jointly and severally liable to the purchaser.

79.     Pursuant to O.R.C. §1707.43, Plaintiffs and each member of the Proposed Class are entitled to rescind the respective purchase of Unregistered Securities on behalf of their IRA accounts and to recover the purchase price from "every person who has participated in or aided the seller in any way in making such sale or contract for sale."

80.     Defendant Kingdom Trust participated and aided Apostelos in selling the Unregistered Securities to Ms. Boyd and other members of the proposed Class.  Indeed, the purchases of Unregistered Securities by Kingdom Trust on behalf of Class Members (including Ms. Boyd) who had IRA accounts with Kingdom Trust could never have materialized without Kingdom Trust's execution of the purchases with assets from those IRA accounts under Kingdom Trust's control.

81.     Defendant Pensco participated and aided Apostelos in selling the Unregistered Securities to Mr. Flanders and other members of the proposed Class.  Indeed, the purchases of Unregistered Securities by Pensco on behalf of Class Members (including Mr. Flanders) who had IRA accounts with Pensco could never have materialized without Pensco's execution of the purchases with assets from those IRA accounts under Pensco's control.

18

82.     Defendant John Does, 1-25, participated and aided Apostelos in selling the Unregistered Securities to members of the proposed Class.  Indeed, the purchases of Unregistered Securities by John Does, 1-25, on behalf of Class Members who had IRA accounts with John Does, 1-25, could never have materialized without John Does', 1-25, execution of the purchases with assets from those IRA accounts under John Does', 1-25, control.

83.     No Plaintiff knew or had reason to know Apostelos was operating a Ponzi scheme until, at the earliest, when Apostelos was forced into bankruptcy in October 2014 and/or was subsequently investigated and indicted for his fraudulent behavior.

84.     Pursuant to O.R.C. §1707.43, although the Unregistered Securities are already in the Defendants' possession, Plaintiffs hereby tender to Defendants, or will tender in open court, their respective Unregistered Securities.

85.     Pursuant to O.R.C §1707.43, Defendants are liable to each of their respective customers and former customers for the full amount paid by each for their respective purchases of Unregistered Securities.

## PRAYER FOR RELIEF

Wherefore, Plaintiffs respectfully pray for judgment against the Defendants pursuant to O.R.C. §1707.43 and request this Court:

A.  Determine this action is a proper class action, and certify Plaintiffs as Lead Plaintiffs and as Class Representatives under Rule 23 of the Federal Rules of Civil Procedure;

2275711.4

B.  Award compensatory damages in favor of Plaintiffs and all other Class Members against Defendants for the full amount paid for the Unregistered Securities by the Plaintiffs and all other Class Members through their respective IRA accounts;

C.  Award Plaintiffs an incentive payment for serving as Class Plaintiffs;  and

D.  Such other and further relief as the Court deems proper and appropriate under the circumstances.

Respectfully submitted,

/s/ Toby K. Henderson
Toby K. Henderson, Trial Attorney     (0071378)
Scott S. Davies                                       (0077080)
SEBALY SHILLITO + DYER
A Legal Professional Association
1900 Kettering Tower
Dayton, OH  45423
937/222-2500
937/222-6554 (fax)
thenderson@ssdlaw.com
*Attorneys for Plaintiffs*

20

2275711.4

## DEMAND FOR TRIAL BY JURY

Plaintiffs Cynthia H. Boyd and Thomas E. Flanders hereby demand a trial by jury to decide all claims and issues so triable in this case.

/s/ Toby K. Henderson
Toby K. Henderson

2275711.4